MINNICK, APPELLEE, *v.* INDUSTRIAL COMMISSION OF OHIO, APPELLANT.

(No. 432—Decided November 20, 1956.)

*Mr. W. S. Marshall* and *Mr. Robert E. Hall,* for appellee.
*Mr. C. William O'Neill,* attorney general, and *Mr. James L. Young* and *Mr. John M. Tobin,* for appellant.

McCLINTOCK, J.   This is an appeal on questions of law from a judgment of the Court of Common Pleas of Ashland County.   We will refer to the parties as they were designated in the court below, to wit: Dorothy Minnick, as plaintiff, and the Industrial Commission of Ohio, as defendant.

This cause originated in the Court of Common Pleas of Ashland County, upon appeal from a determination by the defendant that plaintiff was not entitled to participate in the benefits of the Workmen's Compensation Act of Ohio.   In her petition on appeal, she alleges that her decedent, John G. Minnick, died as the result of an injury sustained in the course of his employment at the Faultless Rubber Company.   The cause was tried to a jury, a verdict was rendered in favor of the plaintiff, and judgment was entered thereon.

Defendant filed a motion to vacate the judgment rendered

therein and to render judgment in its favor for the reason that it is entitled by law to a judgment in its favor on the evidence received at the trial. Said motion was overruled by the court below, and thereafter defendant appealed to this court on questions of law.

The facts in this case, as shown by the record, are as follows: John G. Minnick, decedent, became an employee at the Faultless Rubber Company in May 1953, and during his entire term of employment he worked in the press room. His job was that of a maker of rubber hot water bottles. Minnick was a large, strong man, being over six feet tall and weighing more than 200 pounds.

On November 2, 1953, decedent was performing his usual work in the usual manner. All the conditions of his environment were the same as they ordinarily were. The temperature was 90 to 95 degrees, the large intake exhaust fan was operating, and each motor was provided with a small individual fan. Decedent's production of hot water bottles on this morning was comparable to his production on previous mornings. Decedent complained of indigestion, and was perspiring heavily. The supervisor took him to the rest room and later to the first aid station, and he died at 11:50 a. m. of the same day, the cause of death being listed as coronary occlusion. The interval between the onset and death was one hour and fifty minutes.

The record shows that one witness testified as follows:

"Q. Will you state your name, please? A. Knox Chamberlain.

"Q. Where do you live, Mr. Chamberlain? A. Route 3, Ashland, Ohio.

"Q. Knox, were you acquainted with the decedent in this case, John G. Minnick, during his lifetime? A. No.

"The Referee: Part of his lifetime? A. Yes.

"Q. Knox, were you working at the Faultless Rubber Company on the day of Mr. Minnick's death? A. Yes.

"Q. Where were you working there on that day? A. I was working in the press room.

"Q. And where was Mr. Minnick working that day? A. He was working in the press room, too.

"Q. Were you doing the same type of work he was doing? A. Yes.

"Q. What type of work was that? A. Making hot water bottles.

"Q. All right, now, during the morning of the day of his death as he worked, how far away from him were you where you were working? A. Approximately from here over to the end of those seats, I suppose.

"The Referee: Indicating about 12 or 15 feet, do you think? A. That is right.

"Q. And was he in your sight all the time while he was working that morning? A. Yes.

"Q. Could you see him? A. Yes.

"Q. Now, when did you first go to work for the Faultless Rubber Company? A. It was in about the—I think the last of January or the first of February, 1953. It was around in there someplace.

"Q. Did Mr. Minnick come to work after you were there? A. Yes.

"Q. Have you any recollection as to when he came to work? A. No, I don't. It was, I would say a month or so after. I wouldn't know when.

"Q. All the time from the time you first started there until Mr. Minnick's death, did you do this work in the press room you described? A. No.

"Q. What did you first do? A. When I first went in there, they didn't have a job open in there, so I worked—well, they was taking inventory for about three weeks and they wanted me to work there until the job was open.

"Q. When did you do the first work such as you described in the press room? A. Gosh, I think it was about—I couldn't tell you, about three or four—I don't know the exact date I went to work. It was around, say the last of March or the first of April.

"Q. Now, when Mr. Minnick first came to work there, did he come to work right to the press room? A. To my knowledge.

"* * *

"Q. Now, on the day of Mr. Minnick's death, will you describe the conditions in the press room as to the temperature, humidity and the quality of the air? A. Well, it was a hot day, I imagine it was 95 in there, inside in the press room, and the air was relatively humid. And let's see, what else do you want?

"Q. What were you pressing or what were you making in that press room, on November 2, 1953? A. I was making hot water bottles.

"Q. Now, what is the texture, what are they made of? A. Well, I really couldn't tell you the true ingredients.

"Q. Is it a rubber product? A. They call it a stock—yes, it is a rubber product, it is a mixture. I don't know the formula of it.

"Q. All right. On this particular morning of November 2, 1953, were there any rubber fumes in the area where you were working? A. Well, I would say yes because there usually always is.

"Q. Now, what type of clothing did you have on while you were working there on that particular morning? A. I wouldn't say for sure, but—

"Q. What was the usual attire you wore on your job, what did it consist of? A. Usually I wore a pair of overalls and a T shirt, that is what I had on that morning, probably.

"Q. Was the temperature in the room on this particular morning any higher or any lower than it had been on other mornings when you worked in that room? A. I don't know.

"Q. Were the fumes which you smelled in the room on that particular morning any more severe or any less severe than they had been on any other morning when you worked in that room? A. I don't know on that.

"Q. Now, I want to be as specific as you possibly can, Mr. Chamberlain, and tell me, to the best of your recollection, what kind of a day it was outside the plant on November 2, 1953? A. To the best of my knowledge it was a day—it was overcast, the sun would come out now and then, but the air was heavy out and the fumes inside just couldn't get out."

Another witness testified, as follows:

"Q. What is your name, please? A. Lee O. Riley.

"Q. What is your address? A. 1007 King Road, Ashland, Ohio.

"Q. Are you presently employed? A. Yes, sir.

"Q. Where are you employed? A. Faultless Rubber Company.

"Q. How long have you been employed there? A. Twenty-four years.

"Q. What has your job consisted of during those years? A. I have been supervisor for about twenty years.

"Q. Now, as supervisor of the Faultless Rubber Company, you had, under your supervision, the decedent in this case, John Minnick? A. I have.

"Q. What department? A. What is known as the hot water bottle cure room.

"Q. And what was his job during November of 1953? A. He was known as a bottle press man, or bottle moulder.

"Q. What type of work did he do as a bottle moulder? A. You want a description?

"Q. Yes. A. Well, these bottles are made from steel moulds or iron moulds that fit inside the bottles. That is, the cores. These are cured under pressure and steam and the idea of the whole thing is we put the uncured rubber in these moulds, cure it, and then it is stretched over the core.

"Q. Did he do any lifting? A. Yes, sir.

"Q. What? A. He—you mean approximately what weight?

"Q. Yes. A. Well, these moulds weigh around 100 pounds, some a little more than that; the ones he had weighed around 100 pounds. These moulds are hinged with a hinge just like a book and in the operation he actually does, he slides the mould off the press and takes a hold of the pan with both hands, sets this up again on the press; the top half of the mould.
"* * *

"Q. And, sir, do you recall when—approximately—this man was hired? A. It was in May, around the middle of May, I think, maybe the 13th or 15th of 1953.

"Q. And he worked until his death on November 2? A. That's right, steady work.

"Q. He was at the same job, basically, and the same room during this time? A. That's right.

"Q. In the bottle pressure room? A. Bottle moulding room.

"Q. Moulding room—is that pretty much the same as a pressure room? A. About the same, yes.

"Q. Now, during the year of 1953, did you have occasion to go through the place where he worked, the bottle moulding room, the bottle pressure room? A. Yes.

"Q. How often did you go through? A. Quite often.

"Q. Approximately how often—every several minutes? A. Yes.

"Q. Was that day after day? A. Day after day.

"Q. Was that during the entire year? A. Yes.

"Q. Did you do this every several minutes during November of 1953? A. Yes.

"Q. Did you continue doing so on the day of November 2, 1953, the day he died? A. That is correct.

"Q. Would you describe to us whether or not he worked with other people in that room? A. That's right, there were several people doing the same operation.

"Q. Was it a large or a small room? A. About 150 long and 70 feet wide.

"Q. Are there any fans or ventilators in that room? A. Yes.

"Q. How many are there and what kind? A. We have fans that blow air in and suck it out, and one type the operator has a fan of his own and he can regulate or adjust it to suit himself.

"Q. How was he dressed while he worked at the time he died? A. Ordinarily he worked in an undershirt and a pair of cover-alls.

"Q. Did he work in that manner during November, 1953? Particularly the last day, the day he died? A. Yes, a T-shirt.

"Q. On the day that he died, November 2, 1953, what would you say the temperature was in that room? A. At that time of the year, the temperature ordinarily runs from 90 to 95 degrees.

"Q. In other words, it is hotter than it is outside? A. Yes.

"Q. He worked at that temperature all year long? A. That's right.

"Q. And he performed that particular job at that particular temperature in that particular room during the entire period he was employed by the Faultless Rubber Company? A. Yes.

"Q. On this particular day, November 2, 1953, the day on which Mr. Minnick died, as far as you could observe from going to that room every several minutes, was there anything different about the temperature on that day as compared to all the other days during the fall of 1953? A. No.

"Q. As you observed him working there during this day of his death, November 2, 1953, I will ask you whether or not you noticed anything about the way he performed his work which would indicate to you that he was having or experiencing any sort of difficulty in the performance of his job or work? A. No.

"Q. Now, did he make any complaint to you during the performance of his work on that day he died, November 2, 1953? A. No.

"Q. I believe your attention was called to the fact that he was in the men's room there on this day he died; who called your attention? A. The assistant foreman.

"Q. Did you see Mr. Minnick in the men's room? A. Yes.

"Q. When you arrived there, would you describe him as you saw him, as to his physical appearance? A. When I first observed him, he was sweating bad and seemed to have pains in his bowels or in his stomach.

"Q. Just describe him as you saw him.

"The Referee: Only what you could see about him.

"A. He was sweating bad, no question about that. I asked him what was wrong and he thought he had some kind of indigestion or something like that, and I asked him if he ever had a heart attack and he said, no, he never had. A few minutes after that he was in the men's room, I stayed with him through a time and he got so he felt better and he walked from there to the hospital."

While defendant filed five assignments of error, the only question to be decided is, was the death of plaintiff's decedent, John G. Minnick, the proximate result of an accidental injury sustained in the course of and arising out of his employment?

Two medical experts testified for plaintiff. Neither of these physicians saw the patient until after he had died.

The supervisor of the mould department testified it was customary to produce more bottles during the early part of the shift and then to slack off a bit during the rest of the day.

Plaintiff, in propounding hypothetical questions to expert medical witnesses called on her behalf, asked them to assume that the decedent worked hard and strenuously on the morning of November 2, 1953, because he got behind in his daily piece production. There is no evidence in the record to support the fact that he had worked strenuously and hard in the morning, and the only evidence was that he was producing the usual number of bottles during the early part of his shift that day, and for that reason the hypothetical questions to the doctors did not correctly state the facts. It is true that the work required in the mould room was difficult work, but that factor does not make this claim compensable.

We cite *Industrial Commission* v. *Franken*, 126 Ohio St., 299, at page 301, 185 N. E., 199, wherein it was held:

"The right of recovery in any case such as this cannot be determined upon the theory that the work in which the employe was engaged was heavy, or of a strenuous character, and by reason of long continuance resulted in physical impairment. It cannot be claimed that there may be a recovery from the Workmen's Compensation Fund by reason of a disease or physical ailment not the direct result of an injury. The Constitution, and the statute enacted thereunder, have made a clear distinction between injury and disease, and the only diseases which have been made compensable are certain occupational diseases enumerated by the statute. The fact that work being done by the employe is light or heavy work has no place in the consideration of the right to recover, for what is heavy work for one man may for another be so light as to involve no hazard at all. Impairment of physical condition accruing from constant and continued labor, no matter how heavy or arduous it may be, is not covered by the workmen's compensation law."

In *Nelson* v. *Industrial Commission*, 150 Ohio St., 1, at page 13, 80 N. E. (2d), 430, it was held:

"Although a liberal construction is justly required in the interpretation of the Workmen's Compensation Act, in order to have death compensation there still must be some evidence

that the death of the workman was caused or contributed to by some act which was different in kind or in exertion from the regular, ordinary work performed by the workman and those engaged in like occupation.''

In *Stevens* v. *Industrial Commission*, 145 Ohio St., 198, 61 N. E. (2d), 198, the court held:

''1. Where an employee is killed during working hours at a place distant from the locus of his employment or the situs of his duties, there is a presumption, in the absence of evidence to the contrary, that his death did not occur in the course of and arise out of his employment within the meaning of the Workmen's Compensation Act.

''2. In a proceeding to recover workmen's compensation, the burden of proof is upon the claimant to show that the injury to or death of the employee occurred in the course of and arose out of his employment.''

In *Gerich* v. *Republic Steel Corp.*, 153 Ohio St., 463, 92 N. E. (2d), 393, paragraph one of the syllabus reads:

''Under the Ohio Workmen's Compensation Act, to entitle a workman to compensation for injury, he must suffer a traumatic injury in the course of and arising out of his employment other than an injury which may occur in the regular course of nature from the usual and normal activities of his employment.''

In the opinion, at pages 465 and 466, it is stated:

''To illustrate, an injury has been held to be compensable under circumstances as follows:

''Feet of filling-station employee frozen during hours of employment (*Kaiser* v. *Industrial Commission*, 136 Ohio St., 440, 26 N. E. [2d], 449); night watchman stumbled over machinery, resulting in paralysis (*Drew* v. *Industrial Commission*, 136 Ohio St., 499, 26 N. E. [2d], 793); heat exhaustion suddenly suffered as the result of employment in a foundry (*Malone* v. *Industrial Commission*, 140 Ohio St., 292, 43 N. E. [2d], 266); infection resulting from the lifting of a heavy roll of fabric (*Maynard* v. *B. F. Goodrich Co.*, 144 Ohio St., 22, 56 N. E. [2d], 195); death due to inhalation of fumes escaping from a gas producer (*Stough* v. *Industrial Commission*, 148 Ohio St., 415, 75 N. E. [2d], 441).

"On the other hand, an injury has been held not to be compensable under circumstances as follows:

"Collapse by a baker from acute dilatation of the heart while handling dough in his regular employment (*Goodman* v. *Industrial Commission*, 135 Ohio St., 81, 19 N. E. [2d], 508); death from angina pectoris a short time after assisting in handling a heavy barrel of rubbish (*Haviland* v. *Industrial Commission*, 135 Ohio St., 545, 21 N. E. [2d], 658); coronary occlusion suffered by an employee after assisting in loading five barrels of beer on a truck (*Vogt* v. *Industrial Commission*, 138 Ohio St., 233, 34 N. E. [2d], 197); cerebral hemorrhage suffered by a lineman while he was at the top of a tall tower (*Cordray* v. *Industrial Commission*, 139 Ohio St., 173, 38 N. E. [2d], 1017); catch or snap in employee's back allegedly suffered as a result of handling bags of lampblack in his usual employment (*Matczak* v. *Goodyear Tire & Rubber Co.*, 139 Ohio St., 181, 38 N. E. [2d], 1021); death from gastric ulcer allegedly due to high nervous tension by reason of conditions at his place of employment (*Shea* v. *Youngstown Sheet & Tube Co.*, 139 Ohio St., 407, 40 N. E. [2d], 669); arthritis aggravated by the use of heavy pneumatic air hammer, while occupying cramped position (*Reynolds* v. *Industrial Commission*, 145 Ohio St., 389, 61 N. E. [2d], 784); employee fell in the restroom—cause of death angina pectoris (*Stanfield* v. *Industrial Commission*, 146 Ohio St., 583, 67 N. E. [2d], 446); cerebral hemorrhage allegedly caused by working in a stooped and strained position (*Nelson* v. *Industrial Commission*, 150 Ohio St., 1, 80 N. E. [2d], 430); death of a motorman from coronary thrombosis when he was subjected to physical and nervous strain in driving a passenger bus through heavy fog (*McNees* v. *Cincinnati Street Ry. Co.*, 152 Ohio St., 269, 89 N. E. [2d], 138)."

In *Burens* v. *Industrial Commission*, 162 Ohio St., 549, 124 N. E. (2d), 724, the syllabus reads:

"1. The hypothesis upon which an expert witness is asked to state an opinion must be based upon facts within the witness' own personal knowledge or upon facts shown by other evidence.

"2. An expert witness must confine his opinion to matters within his specialty or scientific field of inquiry and may not

express an opinion upon matters as to which the jury is capable of forming a competent conclusion.

"3. In an action to determine the right of the widow of a deceased employee to participate in the insurance fund established by the Workmen's Compensation Act, an expert witness, in answering a hypothetical question concerning the causal relationship between the death and employment, may not draw an inference of injury from the premises stated, where such premises do not contain the fact of injury, and then proceed to base an opinion thereon as to causal relationship, where such inference is not confined to matters properly within the scientific field of inquiry of the witness.

"4. To permit a jury to make a choice between two irreconcilable inferences raised by the facts in evidence as to the existence of accidental injury is to substitute speculation and conjecture for proof; and in such a situation a jury question is not presented."

In conclusion, by reason of the facts as shown by the record and the law as herein cited in this opinion, we find that the death of plaintiff's decedent, John G. Minnick, was not the proximate result of an accidental injury sustained in the course of and arising out of his employment and for that reason the judgment of the Court of Common Pleas is reversed and final judgment is entered in favor of defendant.

*Judgment reversed.*

MONTGOMERY, P. J., and PUTNAM, J., concur.